ELY NAYLOR, petitioner-appellant,

*v.*

GERTRUDE NAYLOR, defendant-respondent.

[Submitted May term, 1931. Decided February 1, 1932.]

*Mr. Jacob S. Karkus,* for the petitioner-appellant.

*Mr. Thomas L. Hanson,* for the defendant-respondent.

The opinion of the court was delivered by

DALY, J.

The petitioner filed a petition seeking to have the marriage between himself and the defendant annulled because "defendant was incapable of consenting thereto, at the time of the marriage, she then being a lunatic, and of unsound mind, and bereft of reason to fully comprehend the nature of the

marriage contract, and deprived of the will to give intelligent consent thereto" and that petitioner was ignorant of defendant's said incapacity at the time. A solicitor for the guardian *ad litem* of the defendant was appointed, and he reported that, upon due investigation, he believed there was no just or equitable defense which could be interposed on behalf of the defendant. The cause was thereupon referred to a special master who took testimony and reported favorably to the petitioner. The advisory master, however, in a memorandum or opinion, advised a decree of dismissal. From the decree entered thereon petitioner appeals.

The petitioner's testimony showed that he was married to the defendant on June 26th, 1910. No member, either of the petitioner's family or of defendant's family, was present at the wedding. Petitioner was seventeen years old when he began his courtship of the defendant who was then sixteen years of age. He visited her at her home once or twice a month for "a couple of hours." They would go riding or attend the movies. He testified that she "was very quiet, never talked much and never had very much to say." After about two years of this quiet courtship, they, on June 26th, 1910, married and lived with the petitioner's father and mother. Petitioner was a farmer. He left his parents' home about eight months after his marriage to farm a place near Englishtown, the defendant accompanying him. Petitioner testified that his wife would not arise early, would get her breakfast and immediately return to bed, was untidy as to her looks and not cleanly; that when they had company "she would never act respectable." He also said that she frequently did not prepare his meals. She never seemed to have been much of a helpmate. On July 30th, 1917, a child was born of the marriage. The wife does not seem to have been any more efficient in the care of the child than she had been in the care of herself or of her home. About three months after the birth of the child, she was committed to the state hospital for the insane at Trenton after examination by two physicians. She remained there about nine months, when the petitioner took her back to their home. Her condi-

tion did not improve. The testimony indicates no resumption of marital relations while she remained there. She was again committed to the state hospital on May 24th, 1926, and has been there ever since. The sister of petitioner was a witness in his behalf and she corroborated petitioner's story in a general way.

The remaining witnesses for petitioner were doctors. One had never seen the defendant and testified as an expert, basing his opinion upon the testimony given by the other witnesses. His opinion was that the defendant was then mentally defective and had been for a number of years and that at the time of her marriage she could not have "judged the seriousness of the new life she was entering into." In reply to a hypothetical question, he gave also as his opinion that since the first manifestation of her insanity (the date not specified) she could not have recovered to a sufficient degree to be able to understand and comprehend the nature of the marriage ceremony, the purpose of the marriage and the obligations and duties incident to the marriage relation. The case being uncontested, of course, no objection was made to his testimony. Another of the physicians had known defendant for ten years. He had examined her for the purpose of her first commitment to the state hospital. He saw her after her return from the hospital. He testified she was suffering from insanity when he first saw her. He then found her in a swamp and there was difficulty in getting her back to the house. He testified that from her conduct his opinion was that she could not at any time prior to her marriage understand the nature of the marriage ceremony. He testified she had delusions and suffered from depressive insanity and that her condition would be progressive; that she did not understand and know the "full import of marriage," and in her condition was unable to understand the nature of the contract which she was entering into. This doctor gives his opinion of the mental capacity of the defendant as to a time about ten years before he first saw or knew her. The third doctor had known defendant all her life. He had signed her commitment to the state hospital. He testified

her condition was then the same as before the marriage. Her mother "had peculiarities" and her father, though a drunkard, was mentally all right." His opinion was that the defendant could not, at any time, have been able to understand the nature of the marriage ceremony, its obligation and duties. He did not testify as to anything this woman said or did before her marriage or after her marriage up to the time of the birth of her child, upon which he based his personal opinion. Of course, in considering the testimony produced, it must be remembered that, after the certificate filed by the solicitor of the guardian *ad litem,* the cause proceeded *ex parte* and petitioner's testimony, and the testimony of his witnesses, was not probed or qualified by cross-examination but stood as given.

Except for the opinion testimony of the physicians, there is nothing to indicate that the defendant was insane at the time of her marriage. Vice-Chancellor Green said in reference to such testimony in *Kern* v. *Kern, 51 N. J. Eq. 574* (at *p. 585*), "the abstract opinions of medical experts as to a person's mental condition may be entirely satisfactory in the consideration of the subject from a medical standpoint, but in the solution of questions involved in judicial investigation, they must be tested and qualified with reference to the facts on which such opinions are based. A man may be mentally unsound in a medical point of view, from certain conditions which exist, which would not, in a legal sense, relieve him from responsibility. He may be subject to mania, and, medically, of unsound mind, yet if the peculiar phase of mania had no influence upon the act brought in question, such act is not, in the law, invalidated; he may be an imbecile and, medically, of unsound mind, but if he has sufficient mind to reasonably understand the act which is brought in question, he is legally competent. To judicially determine if the person is, in a legal sense, of unsound mind, we must therefore have the facts on which medical gentlemen have proceeded in forming their opinion."

It is also stated in the same opinion, "the weight of the authorities is that no greater, if as much, mental capacity

is requisite to make binding a matrimonial, than is required for ordinary business contracts or a valid testamentary disposition of one's estate." * * * "The court will not be justified in annulling a marriage because of the alleged weakness of intellect of the contracting party."

There was nothing in the conduct of the defendant from the time of her courtship, beginning at the age of sixteen years, to the time of her motherhood at the age of twenty-five years, testified to by the petitioner, or his witnesses, which would justify the conclusion that she did not have a reasonable understanding concerning her marriage, when she was of the age of eighteen years. It is true that the girl came from a home life that was not elevating; and it is believable that she lacked higher sentiment, emotion and intelligence; that after her marriage she was lazy and untidy. It may be justified by the testimony to assert that she was dull and stupid; it may be even further asserted that her mental state was such that her mind became progresssively weaker, culminating in her insanity following the birth of her child, but this testimony does not prove that at the time of the marriage she lacked the capacity to consent to her marriage, or that she was so deficient in mentality that she did not have a reasonable understanding of the marriage contract.

The opinion of the advisory master states that no fraud was employed to induce petitioner to marry the defendant and that petitioner was aware of the mental weakness of defendant prior to the marriage and immediately subsequent thereto, so that he was not entitled to the relief asked. The decree dismissing the petition will be sustained, not for the reasons advanced by the advisory master who advised the decree, but because the petitioner did not prove, as alleged in his petition, that at the time of the marriage the defendant was mentally incapable of consenting thereto, being then a lunatic and of unsound mind, and bereft of reason truly to comprehend the nature of the marriage contract and deprived of the will to give intelligent consent thereto.

The decree below will be affirmed.

608

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, CAMPBELL, LLOYD, CASE, BODINE, DALY, DONGES, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, KERNEY, JJ. 15.

*For reversal*—None.